UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MIDTOWN TDR VENTURES LLC and MIDTOWN GCT VENTURES LLC,<br><br>                  Plaintiffs,<br><br>   v.<br><br>THE CITY OF NEW YORK, THE CITY COUNCIL OF THE CITY OF NEW YORK, SL GREEN REALTY CORPORATION, 51E42 OWNER LLC, GREEN 110 EAST 42ND LLC, GREEN 317 MADISON LLC, SLG 331 MADISON LLC, SLG 48E43 LLC, and SL GREEN OPERATING PARTNERSHIP, L.P.<br>                  Defendants. | **CIVIL ACTION NO.** _____<br><br>**JURY TRIAL DEMANDED**<br><br><u>**COMPLAINT**</u> |

Plaintiffs Midtown TDR Ventures LLC and Midtown GCT Ventures LLC ("Plaintiffs" or "Midtown"), by and through its attorneys, allege as follows:

## <u>NATURE OF THE ACTION</u>

1.     This action arises out of an unlawful taking by the City of New York (the "City") of Plaintiffs' property for the benefit of an influential private real estate developer, SL Green Realty Corporation ("SL Green").

2.     Midtown is the owner of Grand Central Terminal, which the City designated as a landmark in 1967.  For over forty-five years, the City's zoning laws have preserved landmark owners' property interests in their unused "air rights", *i.e.*, the pre-existing rights to build on the site, by allowing the rights to be transferred to neighboring sites to enable those sites to be developed to greater height and density than otherwise would be permitted.

3.     The value of these transferrable development rights ("TDRs") is equivalent to and in some cases greater than the land itself, because the higher floors that TDRs enable developers

to build often command premium pricing.  Because TDRs enable landmark owners to retain value in their property that would otherwise be destroyed by a landmark designation, they play a critical role in the preservation of landmarks by allowing properties to be designated as landmarks in New York City without requiring the City to pay just compensation or violating the Constitutional rights of their owners.

4.     When it designated Grand Central Terminal a landmark, the City represented that Grand Central Terminal's TDRs would have substantial "value" and could be "profitably transferred" to a number of nearby sites.  In fact, the City's assurances that Grand Central's owners retained valuable TDRs enabled the City to win the seminal *Penn Central* case in the United States Supreme Court, a constitutional challenge by Grand Central's then-owners to the City's refusal to approve their plans to develop the site.

5.     In reliance on the City's representations, Midtown acquired Grand Central Terminal in December 2006.  The Terminal itself had little value; it was subject to a 300-year lease with the Metropolitan Transit Authority at minimal rent.  But the property still had over 1.2 million square feet of unused TDRs, and Midtown made its investment in order to acquire these TDRs, reasonably expecting to be able to sell them to nearby sites.  The prime sites for potential sales of Grand Central Terminal TDRs at the time of Midtown's acquisition were within what is known as the "Vanderbilt Corridor," a row of five sites near Grand Central Terminal along Vanderbilt Avenue, three of which appeared likely to be developed in the near future.

6.     The 2008 financial crisis postponed development and any opportunity for Midtown to sell its TDRs.  By 2011, the sites within the Vanderbilt Corridor were the only sites to which Grand Central TDRs could be transferred within the foreseeable future, although they still were sufficient to absorb all of the Grand Central TDRs.  Midtown reasonably expected at

the time of its acquisition of TDRs and thereafter to sell and transfer its TDRs to sites within the Vanderbilt Corridor at market prices.

7.      In December 2011, SL Green, the largest commercial landlord in the City, announced that it had acquired all of the buildings on a full-block site in the Vanderbilt Corridor, directly across Vanderbilt Avenue from Grand Central Terminal.  SL Green's plan was to demolish the existing buildings at that site and erect in their place a massive new skyscraper dubbed "One Vanderbilt."  One Vanderbilt would be one of the world's tallest buildings, dwarfing the Empire State Building and far exceeding the density permitted as-of-right by local zoning.  To achieve the desired density, SL Green would have needed to purchase – and could have purchased – Midtown's Grand Central Terminal TDRs.  This would have enabled Midtown to transfer almost one half of all the unused development rights at Grand Central Terminal.

8.      However, even though SL Green already had determined to build the office building and even though it would have done so using Grand Central TDRs, the Department of City Planning – under the leadership of Commissioner Carl Weisbrod, previously a real estate professional with a firm that has close ties to SL Green – worked privately with SL Green to develop a change to the local zoning laws that effectively *gave SL Green the TDRs for free*, allowing it to construct its office tower without having to buy a single Grand Central Terminal TDR.

9.      Specifically, under prior zoning, in order to build its 1400 foot office tower, SL Green would have been required *both* to make improvements to the local transit and pedestrian network *and* to acquire Grand Central Terminal TDRs.  With the new zoning, SL Green now can construct its office tower *solely* by making the infrastructure improvements, thus eliminating the need to acquire any Grand Central Terminal TDRs.  The rezoning effected the same change for

the other sites in the Vanderbilt Corridor.  As a result, Midtown's TDRs are now effectively unsellable and therefore worthless.

10.   Thus, the City's "zoning" took from Midtown the entire value of the Grand Central TDRs and transferred over $475 million of that value to SL Green, for no purpose other than to reduce SL Green's costs and increase its profits in constructing an office tower *that it was going to build anyway*.

11.   In doing so, the City took away from Grand Central's owner the very value of the TDRs that the City relied upon to win a constitutional challenge to Grand Central Terminal's landmark designation, with the sole purpose and outcome of benefitting a private real estate developer.  This is a classic violation of the Public Use clause of the Fifth Amendment to the Constitution – taking the property of a private citizen for the benefit of another private citizen without any public purpose.

12.   Through this action, Plaintiffs seek a declaration that the City's private "zoning" was invalid as a Takings without Public Use under the United States Constitution, as illegal spot zoning, and as otherwise unlawful under New York City's Zoning Resolution.  In the alternative, if the zoning is shown to have a *bona fide* public purpose and remains in force, then all of Plaintiffs' TDRs will have been rendered worthless and Plaintiffs are entitled to be paid "just compensation" by the City for the value of its TDRs, which Plaintiffs will show is approximately $1,130,000,000.  Plaintiffs also seek damages from SL Green to recover the amount by which it will have been unjustly enriched if it is permitted to build One Vanderbilt without purchasing Midtown's TDRs, currently estimated at approximately $475,000,000.  Plaintiffs seek additional damages from SL Green for the material breach of its confidentiality agreement with Midtown

GCT Ventures LLC that SL Green committed as part of its successful effort to induce the City to effect an unlawful taking of Plaintiffs' property.

## JURISDICTION AND VENUE

13.     This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as it arises under the Constitution and laws of the United States and presents a federal question, and pursuant to 28 U.S.C. § 1343(a)(4) in that it seeks to secure equitable, monetary, and other relief under an Act of Congress, specifically 42 U.S.C. § 1983.  This Court may adjudicate all of the federal claims as a matter of judicial economy, regardless of any prudential ripeness issues.

14.     This Court has supplemental jurisdiction over Plaintiffs' New York State law claims pursuant to 28 U.S.C. § 1367.

15.     This Court is authorized to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rules of Civil Procedure 57 and 65.  Plaintiffs have attempted to persuade the City not to take the actions challenged herein, including by providing testimony and written statements in a timely manner explaining how the proposed actions would be improper and unlawful and a taking of their property in violation of the United States and New York Constitutions.  Notwithstanding this testimony and written statements, the City approved the actions on May 27, 2015.  In addition, Plaintiffs have complied with any obligations they may have had under General Municipal Law § 50-e by serving a Notice of Claim upon the City and City Council on August 25, 2015.  Thirty days have elapsed since the service of that Notice of Claim, and adjustment and payment thereof has been neglected or refused.  Accordingly, an actual case and controversy exists between Plaintiffs and the City and City Council.

16.     Venue is proper within this judicial district, pursuant to 28 U.S.C. § 1391(b), because the relevant events giving rise to Plaintiffs' claims have occurred in this judicial district.

## THE PARTIES

17.     Plaintiffs Midtown TDR Ventures LLC and Midtown GCT Ventures LLC are limited liability companies organized and existing under the laws of the State of Delaware, with their principal place of business at 551 Fifth Avenue, New York, New York.

18.     Defendant City of New York is a municipal corporation duly incorporated and existing under the laws of the State of New York.  The City of New York has established and maintains the City Planning Commission ("CPC") and Department of City Planning ("DCP") as constituent departments or agencies of the City.

19.     Defendant City Council of the City of New York (the "City Council") is the legislative body of the City of New York, as created by Section 21 of the New York City Charter.  At all times relevant hereto, the City Council was responsible for enactment of the legislation challenged in this action.  Unless otherwise indicated, Defendants the City of New York and the City Council are referred to herein collectively as the "City".

20.     Defendant SL Green Realty Corporation, a Real Estate Investment Trust incorporated under the laws of Maryland whose stock is traded on the New York Stock Exchange, has its principal place of business at 420 Lexington Avenue, New York, New York.  Defendants SLG 48E43 LLC, 51E42 Owner LLC, Green 317 Madison LLC, SLG 331 Madison LLC, Green 110 East 42nd LLC, and SL Green Operating Partnership, L.P., are all subsidiaries and/or affiliates of SL Green Realty Corporation that have an interest in sites in the Vanderbilt Corridor and/or are parties to the confidentiality agreement with Midtown GCT Ventures LLC described below.  These entities are referred to herein collectively as "SL Green".  SL Green is

New York City's largest office landlord, with an approximate market capitalization of over $10 billion.

**RELEVANT NON-PARTIES**

21.     The City Planning Commission (the "CPC") is an agency of Defendant City of New York.  The CPC votes on applications concerning the use, development and improvement of real property subject to City regulation, including amendments to the City's Zoning Resolution and special permits authorized thereunder.

22.     The Department of City Planning (the "DCP") is an agency of Defendant City of New York.  DCP supports CPC in its review of zoning text amendments and land use applications that require discretionary action.

23.     The Metropolitan Transportation Authority (the "MTA") is an agency of the State of New York.  Pursuant to a nearly 300-year lease with Midtown, the MTA controls and operates Grand Central Terminal and the tracks and platforms servicing Metro-North Railroad and the future terminus of the Long Island Rail Road at Grand Central Terminal.

**FACTUAL ALLEGATIONS**

**I.     Grand Central Terminal**

24.     Grand Central Terminal is a historic beaux-arts building in east midtown Manhattan, used primarily by the MTA and its subsidiary Metro-North Railroad, as a commuter rail terminal.  The building's south facade faces 42nd Street at its intersection with Park Avenue. At street level, the Terminal is bounded on the west by Vanderbilt Avenue, on the east by the Grand Hyatt Hotel, and on the north by the MetLife building.

25.     On August 2, 1967, New York City's Landmarks Preservation Commission (the "Landmarks Commission") designated Grand Central Terminal a "landmark" under New York

City's Landmarks Preservation Law and designated the city tax block that it occupies a "landmark site".

26.     Under the Landmarks Preservation Law, enacted by the City in 1965, a building designated as a landmark is subject to substantial restrictions on further development, including advance approval from the Landmarks Commission before any exterior changes or additions can be made.

## II.     Landmark Transferable Development Rights

27.     The restrictions placed on Grand Central Terminal as a landmark resulted in the site's owner holding a significant amount of unused development rights.  Privately owned parcels of land in New York City are permitted an as-of-right size and volume, referred to as "density," that is calculated on the site's "floor area ratio" or "FAR."  The FAR for any site in the City is a specified multiple of the total square footage of the underlying lot; the applicable FAR is a function of each lot's zoning classification under the City's Zoning Resolution.  If, for example, maximum as-of-right FAR for a site is 15.0, and the lot size is 135,000 square feet, then the site generates a total of approximately 2 million square feet of floor area for as-of-right development.  However, if the site is already improved with a building designated as a New York City landmark, then, notwithstanding the permitted FAR under the Zoning Resolution, no additional floor area can be built on the site without the approval of the Landmarks Commission.  Thus, if a 300,000 square-foot landmark building were to exist on the site described above, then 1.7 million square feet of otherwise permitted floor area would remain unused.

28.     This was essentially the situation for Grand Central Terminal's owners when it was declared a landmark in 1967.  Recognizing that standing alone the Landmarks Preservation

Law would be unconstitutional, the City passed legislation to preserve landmark owners' property interests in their unused air rights.

29.     Specifically, in 1968, New York City adopted Zoning Resolution ("ZR") § 74-79. This legislation, according to the City's own proposed findings of fact in the *Penn Central* litigation, was "legislation [that] was directed towards landmarks in general, but had as its focus the Grand Central Terminal situation."

30.     ZR § 74-79 created a special permit available by application to CPC that enabled landmark owners to transfer unused development rights to "adjacent" properties. As a condition to approving the special permit, the CPC historically has required the developer of the receiving site to make improvements to public amenities such as subsurface pedestrian passageways leading to public transportation facilities.

31.     In 1969, ZR § 74-79 was amended in further recognition that, without a mechanism to create meaningful and valuable opportunities to transfer unused development rights, landmark owners would be entitled to just compensation from the City under the Takings clause of the Constitution.  As the City (through the DCP) observed in a recent study:

> If the city had to pay every time it landmarked a building, the designation of landmarks would become prohibitively expensive. Depending on the legal theory, enabling landmarks to sell unused development rights would either ***eliminate the basis for a takings claim by allowing the owner to keep its property (albeit in transferable form)***, or compensate the owner for the taking of its property with salable TDRs.  Either way, the landmark would be preserved and the city would not have to pay for it.  Passing Section 74-79 in 1968 and amending it in 1969 ***strengthened the city's hand in ongoing litigation*** that had implications for landmark preservation in the city and across the country.

DCP, "A Survey of Transferable Development Rights Mechanisms in New York City", *at* http://www.nyc.gov/html/dcp/pdf/tdr/research.pdf (emphasis added).

III.    **Penn Central Litigation**

32.    At the time that Grand Central Terminal was landmarked, it was owned by the Penn Central Transportation Company and its affiliates ("Penn Central").

33.    Penn Central operated a railroad station in Grand Central Terminal and collected rent from a variety of commercial interests that leased space in the terminal.  Penn Central also owned several adjacent or nearby buildings, at least eight of which were eligible to receive TDRs from Grand Central Terminal under ZR § 74-79.

34.    In January 1968, Penn Central entered into a 50-year lease and sublease agreement with UGP Properties, Inc. ("UGP") that called for the construction of an office building above Grand Central.  UGP and Penn Central submitted to the Landmarks Commission two plans for construction, both of which would have been permissible as-of-right were it not for the landmarked status of Grand Central Terminal.  However, the Landmarks Commission rejected both plans as inconsistent with the historic beaux-arts façade of the Terminal.

35.    Penn Central and UGP filed suit in New York State Court alleging an unconstitutional taking.

36.    Defending against the Takings claim, New York City relied heavily on the transferability of Grand Central Terminal's unused development rights, arguing that the TDRs represented profitable alternatives to developing above Grand Central, and even that one potential receiving site was "preferable" due to its positioning and access points.  The City further argued that the TDRs were valuable because they could be profitably sold to other developers.

37.    The case was ultimately appealed to the United States Supreme Court, where the City again defended the takings claim on the basis that Penn Central "had failed to show that the

unused development rights could not have been profitably transferred to one or more nearby sites".

38.     The Supreme Court accepted and relied on these arguments in determining "whether the interference with appellants' property is of such a magnitude that there must be an exercise of eminent domain and compensation to sustain it."  Citing the TDRs, the Court commented that Penn Central's ability to exercise its development rights had

> "not been abrogated; they are made transferable to at least eight parcels in the vicinity of the Terminal, one or two of which have been found suitable for the construction of new office buildings. Although appellants and others have argued that New York City's transferable development-rights program is far from ideal, the New York courts here supportably found that, at least in the case of the Terminal, *the rights afforded are valuable*."

*Penn Central Transp. Co. v. City of New York*, 435 U.S. 103, 129 (1978).

39.     Following the Supreme Court's decision, Penn Central's successor in interest and the City of New York entered into stipulations dated February 9, 1987 and May 16, 2002 providing that 1,264,364 square feet of floor area remained available to be transferred from Grand Central Terminal to eligible receiving lots.

## IV.   The Grand Central Subdistrict

40.     In 1992, the City created the Grand Central Subdistrict of the Special Midtown District, principally, in the words of DCP, "to create new provisions for the transfer of development rights" that would "permit the remaining development rights of Grand Central Terminal to be distributed over a wider area."  The Grand Central Subdistrict was created by amendments to the Zoning Resolution enacted under ZR § 81-60, *et seq.* (which encompassed ZR § 81-635 referenced below).

41.     The Grand Central Subdistrict consists of the Grand Central Subdistrict "Core",

which is bounded by 41st Street, 48th Street, Madison Avenue and Lexington Avenue, and also

of the Subdistrict "Wings", which are the areas between 46th Street and 41st Street, extending to

the east side of Lexington Avenue and the west side of Madison Avenue to a distance of 125 feet

except for half a block north and south of 42nd street, where the distance is 220 feet.  The picture

below illustrates the entire Subdistrict with the Core and Wings separated by dashes.



42.     Within the Grand Central Subdistrict, the maximum FAR as-of-right is 15.0, and

this maximum can be increased to 18.0 if the developer pays for an improvement to a subway

station that physically adjoins the development site.

43.     Prior to the Rezoning at issue in this action, a developer seeking to exceed 18.0

FAR could do so only through a transfer of unused landmark development rights.  Within the

"Wings" of the Subdistrict, a developer could (and still may) obtain an additional 1.0 FAR

through a landmark transfer, upon obtaining a certification from CPC, thus allowing

development to reach a maximum of 19.0 FAR.  Within the "Core" of the Subdistrict, ZR § 81-

635 allowed development to exceed basic maximum FAR, up to 21.6 (now, after the Rezoning,

up to 30.0), through a transfer of unused landmark development rights and a special permit from CPC. The formal FAR limits distinguish ZR § 81-635 from the adjacent-property transfer provisions of ZR § 74-79, which have no set FAR maximums.

44.     A special permit is a discretionary action subject to public review and approval under the Uniform Land Use Review Procedure ("ULURP"). Among other conditions, a special permit requires the developer of the receiving site to fund "major improvement of the above- or below-grade, pedestrian or mass transit circulation network in the Subdistrict." In other words, to effect a transfer of landmark TDRs pursuant to ZR § 81-635, the developer of the receiving site not only must acquire the TDRs but also undertake significant improvements to the local pedestrian or transit infrastructure.

45.     A special permit under ZR 81-635 comes with the additional requirement that Grand Central Terminal's owners transfer five percent of the gross proceeds of any TDR sale into a joint fund with the MTA for ongoing maintenance of Grand Central Terminal.

46.     In 1999, ZR § 81-635 was used by the then-owners of Grand Central Terminal to transfer 285,865 square feet to 383 Madison Avenue. To obtain the special permit, the developer undertook substantial improvements to the pedestrian and mass transit circulation network in the Subdistrict.

**V.     Midtown's Purchase of Grand Central Terminal TDRs.**

47.     In December 2006, Midtown purchased Grand Central Terminal from APU and Harlem Railroad Company, subject to a lease to the MTA that runs until February 28, 2274.

48.     In contrast to the previous owners, Midtown did not intend to make use of the Terminal for a railroad or any other purpose. Nor, under the terms of the nearly 300-year lease with the MTA, is Midtown entitled to collect rent from concessionaires within the Terminal.

Additionally, because the Penn Central Lease provided for relatively minimal rent payments, lacked any rent escalation clause (in fact the rent decreased over the life of the lease), and was the subject of a favorable option to purchase in favor of the MTA, it had relatively minimal value. As a result, the TDRs represented over 85% of the property value that Midtown purchased.

49.    Midtown made its investment in reasonable reliance on the City's representations that the "value" of Grand Central Terminal's unused development rights would be preserved because they could be "profitably transferred" to nearby sites. Indeed, TDRs often sell for prices close to land value, and sometimes at a premium to land value given that higher floors often are more valuable than lower floors. A May 2007 appraisal, commissioned shortly after the TDRs were purchased, estimated their value at $300-$410 per square foot and $430 million in total. The assumed TDR receiving sites were principally those along Vanderbilt Avenue. This included One Vanderbilt, the site now under redevelopment by SL Green. Prior to the Rezoning, the TDRs' appraised value was $880 per square foot within the Vanderbilt Corridor.

50.    Although Midtown receives lease payments from the MTA, the lease is separate and distinct from Midtown's TDRs, and the value of that rent stream is de minimis in comparison to the potential value of the TDRs.

**VI.    Solely to Increase SL Green's Profits, and Not for any Public Purpose, SL Green and the City Designed a Rezoning that Eliminated the Need to Purchase TDRs.**

51.    In 2010, with the real estate market beginning to recover from the 2008 financial crisis, industry observers were commenting that "buyers such as SL Green" were targeting "core assets in premier micromarkets such as the Plaza District and Grand Central."

52.     By December 2011, SL Green had completed its assemblage of "One Vanderbilt", the full block site directly across Vanderbilt Avenue from Grand Central Terminal, completing a strategy of buying up low-rise buildings on that site over the course of more than 10 years.

53.     A December 5, 2011 SL Green press release confirmed: "SL Green now owns all of the buildings on the block bounded by Madison and Vanderbilt Avenues between East 42nd and East 43rd streets."  At the time, SL Green's co-chief investment officer described the site as "the single best potential development site in the city, if not the world."

54.     This should have presented an opportunity for Midtown to sell a significant portion of its TDRs.  Specifically, for SL Green to have developed its planned 1.2 million square foot office tower, it would have needed to acquire a substantial amount of Midtown's Grand Central Terminal development rights.

55.     At all relevant times, Midtown was ready and willing to transfer its development rights to SL Green, including at a price set by an independent appraisal in the event that the two sides could not agree on price.  Midtown even was willing to contribute its TDRs toward a joint venture with SL Green.  There was therefore no impediment to SL Green purchasing Midtown's TDRs to build its office tower with a landmark special permit under ZR § 74-79.  In fact, but for the City's unlawful actions, that is what SL Green would have done.

56.     Midtown and SL Green entered into an Agreement dated August 6, 2012 (the "Confidentiality Agreement") to undertake confidential negotiations regarding such a transfer.  A copy of this Agreement is attached as Exhibit A.

57.     However, SL Green had a plan to acquire Midtown's property without paying for it:  persuade the City to give SL Green the ability to construct its proposed building, vastly in

excess of as-of-right zoning limits, without having to acquire any development rights from Midtown.

58.     On January 1, 2014, Bill de Blasio took office as Mayor of the City of New York and soon thereafter appointed Carl Weisbrod Chair of the CPC.  Prior to taking office, Commissioner Weisbrod was a partner at HR&A Advisors ("HR&A"), a real estate development consulting firm with a long history of doing work for SL Green.  The Chairman of HR&A, John Alschuler, has been a Director of SL Green since 1997 and is currently its Lead Independent Director.

59.     SL Green immediately began meeting with the new administration regarding One Vanderbilt.  SL Green's CEO met with Mayor de Blasio shortly after he took office, and SL Green's representatives met with Commissioner Weisbrod and his DCP staff in March 2014, immediately after Commissioner Weisbrod took office.  SL Green and DCP continued to have private, in-person meetings over the next several months.

60.     SL Green's Confidentiality Agreement with Midtown required that SL Green and its representatives keep strictly confidential the "existence, content, and status" of all negotiations and discussions regarding a possible sale of Grand Central Terminal TDRs to SL Green, and not directly or indirectly disclose to or discuss any information about such Negotiations (including the fact that the Negotiations were taking place or the status of such Negotiations) with any person or entity, including with any print, radio, television or other media sources, or with any government authorities, agencies, or other government representatives.  (*See* Exhibit A ¶¶ 1, 4.)

61.     However, in its meetings with the City regarding One Vanderbilt, SL Green ignored these obligations, and in material breach of the Confidentiality Agreement, SL Green not

only disclosed to City officials the existence of its negotiations with Midtown, but also purported to disclose positions taken by Midtown in those negotiations.  For example, New York City Councilmember David G. Greenfield told Midtown that SL Green representatives had claimed to the City that Midtown was "unreasonable" and "impossible to deal with".

62.    These accusations were false.  Since it acquired the TDRs in 2006, Midtown has worked diligently to identify potential development sites and has stood ready and willing to sell its rights to developers, even offering to allow the price to be set by an independent appraisal, and Midtown's leadership had successfully done business with SL Green in the past, unrelated to the Grand Central Terminal TDRs.

63.    SL Green also pressured the City by citing a "major potential tenant that would be lost unless [the zoning changes] move forward quickly."  This too was false, when ultimately it was announced that the "major potential tenant" was an *existing* tenant that planned to lease at most only eleven percent of the building.

64.    Commissioner Weisbrod and DCP credited these assertions and willfully ignored any information to the contrary.  Midtown had at one time retained HR&A and Mr. Weisbrod to advise it on certain matters pertaining to its TDRs, and Mr. Weisbrod knew Midtown was both willing and interested in selling its TDRs at fair market value.  Nevertheless, while DCP was having detailed meetings with SL Green regarding the rezoning, in an April 9, 2014 email (obtained through requests under New York's Freedom of Information Law), Commissioner Weisbrod refused a request to meet with Midtown, claiming (falsely) that the agency was "just beginning to turn our attention to East Midtown" and would "reach out" when it was "ready".

65.    Concerned that a rezoning of the Grand Central Subdistrict was moving forward without any input from Grand Central's owners, Midtown continued to seek a meeting with

Commissioner Weisbrod without success.  Only weeks later, Commissioner Weisbrod called Midtown's Andrew Penson, informing him that the rezoning was "set in stone" and that it was going to "take away [Midtown's] monopoly".

66.     What emerged from DCP's meetings with SL Green was a proposed rezoning of the One Vanderbilt site, along with four other sites running north along Vanderbilt Avenue.

67.     Although the Rezoning comprises a total of five sites, it was tailor made for One Vanderbilt.  In fact, City officials viewed the Rezoning as being all about One Vanderbilt, but the draft press release announcing the plan was amended when the City's public relations consultants pointed out in an e-mail dated May 29, 2014 to City press secretary staff that they should mention the other sites "***so that this doesn't look like spot zoning***" (which is exactly what it was).

68.     The May 30, 2014 press release referred to these five sites as the "Vanderbilt Corridor."  Less than one month later – and only two months after Commissioner Weisbrod told Midtown that his staff was "just beginning to turn our attention to East Midtown" – the DCP released a 70-page Scope of Work for the Vanderbilt Corridor Rezoning plan and the renewed One Vanderbilt project.

69.     The Vanderbilt Corridor sites are all within the Grand Central Subdistrict, would have been eligible receiving sites for Grand Central Terminal TDRs, and indeed were the only sites in the Grand Central Subdistrict with TDR-receiving potential on any reasonable time horizon.

70.     However, the Rezoning eliminates the need to acquire any Grand Central Terminal TDRs in the Vanderbilt Corridor.  The Rezoning allows developers in the Vanderbilt Corridor to exceed the existing 15.0 as-of-right maximum FAR by an additional 15.0 FAR, up to

a new maximum of 30.0 FAR, and allows them to do so by obtaining a new special permit from CPC known as the "Grand Central Public Realm Improvement Bonus" ("Improvement Bonus"). A bonus of this magnitude was unprecedented.  In Manhattan, the City had never granted a bonus of more than 3.0 FAR in exchange for in-kind public improvements.

71.     To obtain the new Improvement Bonus, the developer simply needs to present a package of proposed local infrastructure improvements for approval by CPC.  The Rezoning allows substantial flexibility in the public works required.  The improvements can be "above- *or* below-grade", can be "on-site *or* off-site", and can be improvements "to the pedestrian *or* mass transit network".

72.     The Rezoning did not relax the improvements required in the event of a landmark development rights transfer.  Such a transfer still must include the same "improvement of the above- or below-grade, pedestrian or mass transit circulation network in the subdistrict", and the improvement still must be a "major" improvement.

73.     As demonstrated by the City's own statements in passing the Rezoning, the public improvement requirement for a landmark transfer would not be waived.  For example, at the City Council hearing on the Vanderbilt Corridor Rezoning, Council Member Daniel Garodnick assured his constituents that "no matter what you are doing on development in that area there will be obligations on you to do pedestrian circulation improvements, other improvements in grand central, which of course we will demand on a case by case basis".  As the DCP website summarizes, the City Council adopted the Vanderbilt Corridor Rezoning with modifications that "transit improvements in conjunction with a landmark special permit" would still be "*required*" (emphasis added).

74.     On May 27, 2015, the City enacted the Vanderbilt Corridor Rezoning through passage and/or approval of (1) Resolution Number 723, which amended the City's Zoning Resolution to "facilitate the establishment and regulation of the Vanderbilt Corridor within the Special Midtown District"; (2) Resolution Number 727, which approved modifications to various restrictions provided by the Special Midtown District; and (3) Application No. N 150127 ZRM submitted by the Department of Planning for an amendment to the Zoning Resolution of the City of New York concerning the "Special Midtown District" (collectively, the "Vanderbilt Corridor Rezoning" or "Rezoning").

75.     Simultaneous to its approval of the Rezoning, the City Council approved SL Green's special permit application to build One Vanderbilt, a 30.0 FAR building.  These were City Council approvals of (1) Resolution Number 726, which approved issuance of a special permit pursuant to Section 81-211to Green 317 Madison LLC and Green 110 East 42nd LLC; (2) Application No. C 150129 ZSM submitted by Green 317 Madison LLC and Green 110 East 42nd LLC for a special permit "to allow an increase in floor area to facilitate the development of a commercial building on property bounded by 42nd Street, Madison Avenue, 43rd Street, and Vanderbilt Avenue"; and (3) Application No. C 150130(A) ZSM submitted by Green 317 Madison LLC and Green 110 East 42nd LLC for a special permit pursuant to proposed Section 81-641 (collectively, the "SL Green Special Permit").

76.     Thus, in contravention of over fifty years of zoning practice and in derogation of Midtown's property rights, a building now can be constructed to maximum possible FAR above as-of-right zoning on Vanderbilt avenue, including in the blocks immediately adjacent to Grand Central Terminal, without acquiring a single development right from Grand Central Terminal.

77.     The consequences of this change were not lost on the local Community Boards, which recommended a conditional denial of the Vanderbilt Corridor Rezoning, citing the facts that "the massive FAR bonus for transit improvements is far above comparable precedents and could eliminate the need for applicants to purchase development rights from existing landmarks, thus possibly vacating a key mechanism of the landmarks law."  If, the Community Boards commented, "a 30 FAR can be reached without transfer of development rights, we are concerned about the mechanism under which the existing development rights will be transferred as well as the sites where they can be transferred".  The Community Boards also questioned why a narrow set of five sites was being singled out for rezoning, when discussions of a comprehensive plan for a broader "East Midtown" district were already underway.

78.     Nevertheless, SL Green succeeded in persuading the City to transfer the value and benefits of the necessary Grand Central Terminal TDRs to it without paying Midtown for them.  Whereas previously SL Green would have had to acquire Grand Central Terminal landmark rights and fund infrastructure improvements, now it only needs to make the infrastructure improvements, offering a huge windfall to SL Green and singling out Midtown to bear the sole financial burden of this value transfer.

79.     The SL Green Special Permit granted One Vanderbilt approximately 535,644 square feet of additional development rights as a Public Realm Improvement Bonus.  At fair market values, these development rights are worth approximately $475,000,000, and but for the Vanderbilt Corridor Rezoning and Special Permit, SL Green would have had to acquire these development rights from Grand Central Terminal.  By eliminating this requirement, the Special Permit and the Vanderbilt Corridor Rezoning with which it was inextricably intertwined

transferred the corresponding value and benefit of Midtown's TDRs to SL Green and singled out Midtown to bear the sole burden of granting SL Green a substantial and unjust enrichment.

**VII.   The Rezoning Deprives Midtown of any Viable Economic Use of its TDRs.**

80.   As a result of the Vanderbilt Corridor Rezoning, no developer of a Vanderbilt Corridor site would reasonably choose to acquire Grand Central Terminal TDRs, because the infrastructure improvements that a developer would be required to fund in seeking a special permit for a landmark TDR transfer will be at least as costly as the work required for a Public Realm Improvement Bonus.  Thus, whereas previously developers had to *both* acquire TDRs *and* fund public works, now developers simply must complete public works to achieve maximum possible density.

81.   Once the Vanderbilt Corridor Rezoning was announced, SL Green never once approached Midtown about a sale of TDRs to One Vanderbilt, and there have been no serious approaches from any other developers about a TDR transfer from Midtown, despite development activity at other sites within the Vanderbilt Corridor.

82.   In the absence of the Rezoning, the Vanderbilt Corridor would have offered landmark receiving sites sufficient to absorb the entirety of Midtown's TDRs, and the Vanderbilt Corridor includes the only sites in the Grand Central Subdistrict with the possibility for redevelopment within any reasonable time horizon.  As Commissioner Weisbrod told a *NY Post* reporter in a June 1, 2014 email (obtained through requests under the Freedom of Information Law), "I am unaware of any East Midtown property owner with a concrete development plan in the near term other than those on the Vanderbilt Corridor."

83.   Moreover, there is no realistic prospect that Midtown would be permitted to build a structure above Grand Central Terminal.

84.     Accordingly, the Vanderbilt Corridor Rezoning has completely eliminated the value of Midtown's TDRs.  The only remaining value of Plaintiffs' property is the MTA lease, which provides minimal rent.  Plaintiffs have lost at least eighty-five percent of the value of their Grand Central Terminal property as a result of the Vanderbilt Corridor Rezoning.

**VIII.   The City's Proffered Rationales for the Rezoning Are Pretextual.**

**        A.       The Rezoning Is Not Needed to Incentivize Development.**

85.     The DCP has claimed that the Rezoning is needed to encourage new construction at "development sites along Vanderbilt Avenue that offer the opportunity to provide modern commercial space in the immediate vicinity of Grand Central Terminal in the near term." Notably, the City did not make (because it could not) any finding that the area was blighted.  Nor was the Rezoning part of any larger redevelopment plan targeting blight.  Rather, the City's purported rationale of encouraging development was specific to these identified sites, based on vague purported concerns about the "quality" and "age" of the existing office buildings.

86.     In any event, even this proffered rationale is pretext.  Developers need no incentive to construct new office buildings in the Vanderbilt Corridor, and many developers were already planning projects in that corridor long before this Rezoning was adopted.

87.     For example, as a representative of SL Green stated at the April 13, 2015 subcommittee hearing on the Rezoning, SL Green started to plan its One Vanderbilt development as early as 2011 and began buying up the properties it would need to assemble for that plan.

88.     SL has also been clearing tenants since that time to prepare for redevelopment of the site.  The occupancy of buildings at that site went from 83% in June 2013 to 63% in June 2014.

89.     Similarly, the MTA issued an RFP for redevelopment of its headquarters in the Vanderbilt Corridor on June 19, 2013, nearly two years before the Rezoning was approved, and had already received responses from developers prior to proposal of the Rezoning.

**B.     The Rezoning is Not Necessary for Transit and Public Realm Improvements.**

90.     Another of DCP's purported rationales is to "create a mechanism for linking new commercial development to significant transit and public realm improvements in the overall Grand Central Terminal area."

91.     That rationale is also pretext.  Public works are already required for approval of a landmark transfer special permit.  As stated above in paragraph 73, city officials can, and have indicated that they would, require the same package of improvements for a landmark transfer as they would to grant a developer the new Public Realm Improvement Bonus.

**C.     The Rezoning Was Designed to Eliminate, Not Expand, Opportunities for Landmark Transfers.**

92.     The third rationale propounded by the DCP is to "provide greater options for the transfer of unused landmark development rights."  This is a stark example of government doubletalk.  To enable the DCP to make that insupportable argument, the Vanderbilt Rezoning modified ZR 81-635 to increase the maximum permitted FAR that can be obtained through a landmark TDR transfer on a development site in the Vanderbilt Corridor from 21.6 FAR to 30.0 FAR.  Any perceived "benefit" to landmark owners from this change is illusory.  With the alternative of the Public Realm Improvement Bonus, no developer of a Vanderbilt Corridor site would reasonably choose to acquire Grand Central TDRs.

93.     Vanderbilt Corridor sites are the only sites in the Grand Central Subdistrict that were reasonable receiving sites for Midtown's Grand Central TDRs.  Thus, the purpose and

effect of the Rezoning and Public Improvement Bonus were to strip Midtown of all the benefits and value of the Grand Central TDRs.

94.     In fact, Commissioner Weisbrod told Midtown expressly that his intention for the rezoning was not to "benefit" landmark owners such as Midtown but instead to "break [Midtown's] monopoly".

**IX.     The Special Permit Granted to SL Green Improperly Offers "Zoning for Dollars".**

95.     The public improvements that purportedly justify the density bonus granted to SL Green did not provide the local community the *quid pro quo* required under New York City's Zoning Resolution, because they merely shifted payment of existing obligations from the government to a private party.

96.     As a condition for the Public Realm Improvement Bonus, the City required SL Green to fund improvements to projects termed the "Hyatt North Stairs" and the "New Stair to Mezzanine Below 125 Park Avenue" ("125 Park Stair").

97.     Together, these two improvements have been estimated by SL Green to cost approximately $43,800,000, generating a bonus of approximately 109,500 square feet of floor area.

98.     However, these projects each were part of the environmental mitigation package already required for the approval of two unrelated projects: the No. 7 Subway Extension – Hudson Yards Rezoning and Development Program ("HY Rezoning") and the East Side Access Project.

A.      **HY Rezoning Mitigation Work**

99.      The HY Rezoning contemplates, among other infrastructure projects, the recently completed extension by the MTA of the No. 7 Subway Line from its prior terminus at Times Square to a new terminus at Eleventh Avenue and West 34th Street.

100.      The DCP projected that by 2025, the HY Rezoning would result in significant adverse impacts at the Times Square–42nd Street station and at the 42nd Street–Grand Central station in the morning peak hour (consisting primarily of overcrowding at their stairways).

101.      As mitigation for the increased transit congestion caused by the No. 7 Subway Line under Grand Central Terminal, the DCP promised a set of subway station improvements that included the same Hyatt North Stairs that SL Green has committed to undertake in exchange for the Special Permit for One Vanderbilt.

102.      In its Findings Statement approving the HY Rezoning, the CPC promised that "The City of New York would provide the required funding for all transit mitigation."

B.      **East Side Access Mitigation Work**

103.      The East Side Access Project contemplates, among other developments, expansion of the route system of the Long Island Rail Road ("LIRR") to reach Grand Central Terminal, ending Penn Station as the sole Manhattan destination for LIRR riders.

104.      The MTA contemplated that the new terminus of the LIRR at Grand Central Terminal would cause traffic congestion, including an increase in peak-direction flows on some stairs to the LIRR platforms by 20-25%, and increased crowding on the western stairs and escalators leading from Grand Central Terminal to the subway station mezzanine area.

105.      As mitigation for the increased traffic congestion and crowding, the MTA agreed to improvement work on critical station elements identified in the Final Environmental Impact

Statement prepared by the MTA and the Record of Decision prepared by the Federal Transit

Administration (the "FTA"), including the same 125 Park Stair that SL Green committed to

undertake in exchange for the Special Permit.

106.    The FTA's Record of Decision for the East Side Access project provides that the

costs of mitigation measures will be borne jointly by the MTA and the FTA, with the latter

agency contributing one-half of the cost of these measures as its share of project costs.

**C.    By Causing SL Green to Undertake the Mitigation Improvements Already
        Promised by the MTA and the City, the Community Affected by the SL
        Green Special Permit Has Been Unlawfully Denied the Required "Quid Pro
        Quo" for Added Density.**

107.    The One Vanderbilt Public Realm Improvement Bonus is therefore conditioned

on SL Green funding public works projects that the City and the MTA are already required to

provide in order to effect environmental mitigation for other projects and that have an identified

public funding source.  The implementation of this mitigation was not conditioned upon the

City's redirection of these funds for a use that would address the density that One Vanderbilt was

adding to the Grand Central area; rather, it freed up those funds so that they could be used for

any purpose anywhere in the City.  The MTA's use of these funds was similarly unconstrained.

108.    So that the City would pass its preferred rezoning package, SL Green agreed to

contribute to the City's and the MTA's existing obligations.

109.    The significant increase in density at One Vanderbilt places burdens on the local

community.  Under New York City's Zoning Resolution, that local community must receive the

benefits of the infrastructure improvements that the City has been able to extract from the

developer in exchange for the density bonus.

110.    Here, however, approximately $43,800,000 in projects being undertaken by SL

Green for One Vanderbilt are projects that the City and the MTA were already obligated to

undertake.  To give the local community the *quid pro quo* of the added density, the City should have required SL Green to undertake *new improvements*, beyond what the local community were already due to receive from the City and the MTA for other projects that burden the community. Simply relieving the City and the MTA of existing obligations, and thereby granting them general budget relief, fails to give the local community the *quid pro quo* of the added density granted to SL Green.  Such "zoning for dollars" is prohibited under New York City's Zoning Resolution.

**CLAIMS AGAINST THE CITY OF NEW YORK AND THE CITY COUNCIL OF THE CITY OF NEW YORK**

**CLAIM I:**
**VIOLATION OF THE FIFTH AMENDMENT'S PUBLIC USE CLAUSE**
(U.S. Const. Amend. V; 42 U.S.C. § 1983; 28 U.S.C. §§ 2201, 2202)

111.     Plaintiffs repeat and re-allege paragraphs 1-110 as if fully set forth herein.

112.     The Takings Clause of the Fifth Amendment to the United States Constitution, as incorporated against the states by the Due Process Clause of the Fourteenth Amendment, prohibits the government from taking private property without a "public use."

113.     Midtown possesses a property right in the Grand Central Terminal TDRs.

114.     Through its enactment of the Vanderbilt Corridor Rezoning, and grant to SL Green of the Special Permit for One Vanderbilt, the City has taken that property right for the sole purpose of transferring substantial portions of the value and benefit of Plaintiffs' TDRs to SL Green.

115.     Such transfer of private property to another private party is a taking without a public use, in violation of the Takings Clause of the Fifth Amendment, as incorporated against the states by the Due Process Clause of the Fourteenth Amendment.

116.    All purported rationales proffered by the City for the challenged actions are pretext, designed to mask a private taking.

117.    The City's decision to take Plaintiffs' property interest deprived Plaintiffs of rights, remedies, privileges and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983, including but not limited to, rights guaranteed by the Takings Clause of the Fifth Amendment to the United States Constitution, as incorporated against the States by the Fourteenth Amendment.

118.    Because no amount of compensation can authorize the City's unlawful actions, Plaintiffs need not seek compensation before a state court or a state law remedy prior to initiating this Claim.  This Claim of private taking in violation of the United States Constitution is ripe for adjudication by this Court.  Plaintiffs are entitled to a declaration that the SL Green Special Permit and the Vanderbilt Corridor Rezoning with which it is inextricably intertwined constitute a private taking that is unlawful and invalid under the Fifth Amendment of the United States Constitution, as incorporated against the states through the Due Process Clause of the Fourteenth Amendment.  Plaintiffs are also entitled to damages for the injury to Midtown's property rights by reason of the City's unlawful conduct.

## CLAIM II:
## IN THE ALTERNATIVE, JUST COMPENSATION UNDER THE TAKINGS CLAUSE OF THE UNITED STATES CONSTITUTION
### (U.S. Const. Amend. V; 42 U.S.C. § 1983)

119.    Plaintiffs repeat and re-allege paragraphs 1-110 as if fully set forth herein.

120.    The Takings Clause of the United States Constitution provides that "Private property shall not be taken for public use without just compensation."

121.    Plaintiffs possess a property interest in the Grand Central Terminal TDRs.

122.    Plaintiffs purchased the Grand Central Terminal TDRs with the investment-backed expectation that they would be able to sell them at their fair market value, within a reasonable time period.

123.    The City itself helped create this expectation, including through its representations and arguments in the *Penn Central* litigation, and Plaintiffs reasonably relied on those representations and arguments, as did the courts.

124.    If the Vanderbilt Corridor Rezoning, and grant to SL Green of the Special Permit for One Vanderbilt, is shown to be supported by a *bona fide*, non-pretextual Public Use, then the City has taken the value of Plaintiffs' TDRs without just compensation, in violation of the Takings Clause of the United States Constitution.

125.    The City's enactment of the Vanderbilt Corridor Rezoning and grant to SL Green of the Special Permit for One Vanderbilt deprives the Grand Central TDRs of all but a bare residue of the substantial value that they had prior to the City's actions.

126.    The City's enactment of the Vanderbilt Corridor Rezoning and grant to SL Green of the Special Permit for One Vanderbilt forecloses the possibility that the Grand Central Terminal TDRs will provide Plaintiffs a reasonable return on its investment or allow Plaintiffs to recoup that investment.

127.    The City's actions single out Midtown to bear a burden that in justice and fairness should be borne by the public as a whole.

128.    As a direct and proximate consequence of the City's taking, Plaintiffs are entitled to just compensation in an amount to be established at trial based on the fair market value of the property prior to the taking, currently estimated to be $1,130,800,000

129.   This Court should exercise its discretion to adjudicate this Claim regardless of possible prudential considerations of ripeness because it relies upon the same nucleus of operative facts as the claim for compensation under the New York State Constitution pleaded below, and consequently judicial economy is promoted by having this Court adjudicate all legal claims arising out of such facts.

### CLAIM III:
### IN THE ALTERNATIVE, JUST COMPENSATION UNDER THE TAKINGS CLAUSE OF THE NEW YORK STATE CONSTITUTION
(N.Y. Const. Art. I, § 7(a))

130.   Plaintiffs repeat and re-allege paragraphs 1-110 as if fully set forth herein.

131.   The Takings Clause of the New York State Constitution provides that "Private property shall not be taken for public use without just compensation."

132.   Plaintiffs possess a property interest in the Grand Central Terminal TDRs.

133.   Plaintiffs purchased the Grand Central Terminal TDRs with the investment-backed expectation that they would be able to dispose of them at their fair market value, within a reasonable time period.

134.   The City itself helped create this expectation, including through its representations and arguments in the *Penn Central* litigation, and Plaintiffs reasonably relied on those representations and arguments, as did the courts.

135.   If the Vanderbilt Corridor Rezoning, and grant to SL Green of the Special Permit for One Vanderbilt, is shown to be supported by a *bona fide*, non-pretextual Public Use, then the City has taken the value of Plaintiffs' TDRs without just compensation, in violation of the Takings Clause of the New York State Constitution.

136.    The City's enactment of the Vanderbilt Corridor Rezoning and grant to SL Green of the Special Permit for One Vanderbilt deprives the Grand Central TDRs of all but a bare residue of the substantial value that they had prior to the City's actions.

137.    The City's enactment of the Vanderbilt Corridor Rezoning and grant to SL Green of the Special Permit for One Vanderbilt forecloses the possibility that the Grand Central Terminal TDRs will provide Plaintiffs a reasonable return on its investment or allow Plaintiffs to recoup that investment.

138.    The City's actions single out Midtown to bear a burden that in justice and fairness should be borne by the public as a whole.

139.    As a direct and proximate consequence of the City's taking, Plaintiffs are entitled to just compensation in an amount to be established at trial based on the fair market value of the property prior to the taking, currently estimated to be $1,130,800,000.

**CLAIM IV:**
**VIOLATION OF THE NEW YORK CITY ZONING RESOLUTION**
(N.Y.C. Zoning Resolution §§ 81-64, 81-641)

140.    Plaintiffs repeat and re-allege paragraphs 1-110 as if fully set forth herein.

141.    "A proper *quid pro quo* for the grant of the right to increase the bulk of a building may not be the payment of additional cash into the City's coffers for citywide use." *Municipal Art Society of New York v. City of New York*, 522 N.Y.S.2d 800 (Sup. Ct. N.Y. Cnty. 1987).

142.    The City approved Application C 150129 ZSM by SL Green for a "Zoning Special Permit pursuant to proposed Section 81–641 granting additional floor area for the provision of public realm improvements."

143.    The City was, together with the MTA, already obligated to undertake substantial portions of these improvements as mitigation for the Hudson Yards and East-Side Access Projects.

144.    The City and the MTA have or should have already earmarked funds for the mitigation work they were obligated to undertake as mitigation for the Hudson Yards and East-Side Access Projects.

145.    Because the below-grade improvements proposed by SL Green as part of Application C 150129 ZSM have already been funded by the City or the MTA, the local community has been denied the required *quid pro quo* for the grant of the right to increase the bulk of a building.

146.    Instead, the City's approval of SL Green's Application C 150129 ZSM allows the City and the MTA general budget relief that will not necessarily benefit the local community that is affected by the additional density granted to SL Green.  This is unlawful "zoning for dollars", in violation of the New York City Zoning Resolution.

147.    Accordingly, Plaintiffs are entitled to a declaration that the SL Green Special Permit is invalid and unlawful in violation of the New York City Zoning Resolution.

**CLAIM V:**
**SPOT ZONING**

148.    Plaintiffs repeat and re-allege paragraphs 1-110 as if fully set forth herein.

149.    Spot zoning is unlawful and occurs when a zoning amendment is accomplished "for the benefit of individual owners rather than pursuant to a comprehensive plan for the general welfare of the community."  *Rodgers v. Village of Tarrytown*, 302 N.Y. 115, 124 (N.Y. Ct. App. 1951).

150.    The Landmarks Preservation Law and subsequent zoning law enactments carefully designed a mechanism for transferring development rights that would mitigate the financial burden of landmark designation and avoid a constitutional challenge to the preservation of historical landmarks.

151.    The City's comprehensive plan for the Grand Central Subdistrict therefore includes the preservation of designated landmarks and the ability of owners of those landmarks to transfer their unused development rights to nearby sites at their fair market value.

152.    Plaintiffs' ability to sell the Grand Central TDRs to the owners of receiving sites within the Subdistrict is part of the well-considered, comprehensive plan created by the Landmarks Preservation Law and subsequent zoning law enactments.

153.    The purpose and effect of the Vanderbilt Corridor Rezoning are to prevent the sale of Grand Central Terminal's landmark TDRs, for the sole benefit and enrichment of SL Green, rather than pursuant to a comprehensive plan for the general welfare of the community.

154.    The Vanderbilt Corridor Rezoning undermines the Landmarks Preservation Law and subsequent zoning law enactments and is inconsistent with the City's comprehensive, well-considered plan for the Subdistrict.

155.    Accordingly, Plaintiffs are entitled to a declaration that the Vanderbilt Corridor Rezoning and SL Green Special Permit are invalid as unlawful spot zoning.

### CLAIM VI:
### REVERSE SPOT ZONING

156.    Plaintiffs repeat and re-allege paragraphs 1-110 as if fully set forth herein.

157.    Reverse spot zoning occurs when a zoning amendment singles out individual owners for adverse treatment, in conflict with a well-considered, comprehensive plan for the general welfare of the community

158.    The Landmarks Preservation Law and subsequent zoning law enactments carefully designed a mechanism for transferring development rights that would mitigate the financial burden of landmark designation and avoid a constitutional challenge to the preservation of historical landmarks.

159.    The City's well-considered plan for the Grand Central Subdistrict therefore includes the preservation of designated landmarks and the ability for owners of those landmarks to transfer their unused development rights to nearby sites at their fair market value.

160.    Plaintiffs' ability to sell the Grand Central TDRs to the owners of receiving sites within the Grand Central Subdistrict is part of the well-considered plan created by the Landmarks Preservation Law and subsequent zoning law enactments.

161.    The purpose and effect of the Vanderbilt Corridor Rezoning are to prevent the sale of Grand Central TDRs, contrary to the comprehensive, well-considered plan for the area.

162.    The City did not give adequate consideration to available alternatives that would have avoided any adverse effects on landmarks within the Grand Central Subdistrict and would have been consistent with a well-considered, comprehensive plan for the community.  The City refused to engage meaningfully with Plaintiffs in considering any such alternative proposals.

163.    By enacting the Vanderbilt Corridor Rezoning, the City failed to engage in well-considered, comprehensive planning and singled out Plaintiffs for treatment less favorable than that afforded to other property owners in the Community.

164.    The Vanderbilt Corridor Rezoning undermines the Landmarks Preservation Law and subsequent zoning law enactments and is inconsistent with the City's comprehensive, well-considered plan for the Grand Central Subdistrict.

165.    Accordingly, Plaintiffs are entitled to a declaration that the Vanderbilt Corridor Rezoning and SL Green Special Permit are invalid as unlawful reverse spot zoning.

## CLAIMS AGAINST SL GREEN

### CLAIM VII:
### UNJUST ENRICHMENT

166.    Plaintiffs repeat and re-allege paragraphs 1-110 as if fully set forth herein.

167.    The SL Green Special Permit grants One Vanderbilt approximately 535,644 square feet of additional density as a Public Real Improvement Bonus.  At fair market values at the time of the grant, this density was worth approximately $475,000,000.

168.    But for the Vanderbilt Corridor Rezoning and Special Permit, SL Green would have had to acquire this density by purchasing Grand Central Terminal TDRs from Midtown.

169.    By eliminating this requirement, the Special Permit and the Vanderbilt Corridor Rezoning with which it is inextricably intertwined are unlawful and violate the U.S. Constitution. They have effected an unlawful transfer of Midtown's property to SL Green, resulting in a substantial and unjust enrichment for SL Green.

170.    In equity and good conscience, SL Green should not be permitted to retain this unlawful benefit and should be required to return its value of approximately $475,000,000 to Midtown, its rightful owners.

171.    Plaintiffs are entitled to restitutionary damages of approximately $475,000,000 from SL Green to rectify its unjust enrichment.  The precise amount shall be determined at trial.

### CLAIM VIII:
### BREACH OF CONTRACT

172.    Plaintiffs repeat and re-allege paragraphs 1-110 as if fully set forth herein.

173.    The Confidentiality Agreement, dated August 6, 2012, between Midtown and SL Green was at all relevant times a binding and enforceable agreement under New York law.

174.     Pursuant to the Confidentiality Agreement, SL Green agreed that it and its representatives would keep strictly confidential the "existence, content, and status" of all Negotiations regarding a possible sale of Grand Central Terminal TDRs to SL Green, and would not directly or indirectly disclose to or discuss any information about such Negotiations (including the fact that the Negotiations were taking place or the status of such Negotiations) with any person or entity, including with any print, radio, television or other media sources, or with any government authorities, agencies, or other government representatives.

175.     SL Green materially breached its obligations by making public disclosures, including at least to New York City governmental representatives, regarding the existence, content, and status of its Negotiations with Midtown regarding the possible sale of Grand Central Terminal TDRs to SL Green, including false statements that Midtown's owners had acted unreasonably in those Negotiations and were "impossible" to deal with.

176.     Midtown has fulfilled all relevant obligations under the Confidentiality Agreement and has been damaged as a direct and proximate result of SL Green's material breaches, which among other impacts assisted SL Green in persuading the City to unlawfully take Midtown's TDRs and transfer their value to SL Green.

177.     Midtown is entitled to damages for SL Green's breach of contract in an amount to be determined at trial.

### JURY DEMAND

Plaintiffs demand a jury trial in this action on all issues and claims triable to a jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment as follows:

<u>against the City of New York and the City Council of the City of New York</u>:

A.  Declaring that the Vanderbilt Corridor Rezoning and SL Green Special Permit are invalid under the Fifth Amendment of the United States Constitution, as incorporated against the states by the Due Process Clause of the Fourteenth Amendment, and 42 U.S.C. § 1983 as Takings of Plaintiffs' property without a Public Use;

B.  Declaring that the Vanderbilt Corridor Rezoning and SL Green Special Permit are invalid as unlawful spot zoning;

C.  Declaring that the SL Green Special Permit is invalid under New York City's Zoning Resolution;

D.  Permanently enjoining all implementation and enforcement of the Vanderbilt Corridor Rezoning and the SL Green Special Permit, and all actions to be carried out thereunder;

E.  Awarding Plaintiffs compensatory damages for the City's constitutional violations pursuant to 42 U.S.C. § 1983;

F.  In the alternative, awarding Plaintiffs just compensation for the City's Taking of Plaintiffs' property in violation of the Fifth Amendment of the United States Constitution, as incorporated against the states by the Due Process Clause of the Fourteenth Amendment, and/or Art. I of the New York State Constitution, in an amount to be determined at trial, currently estimated at $1,130,800,000;

<u>against SL Green</u>:

G.  Awarding Plaintiffs restitution from SL Green of its unjust enrichment of approximately $475,000,000 in the precise amount to be determined at trial;

H.  Awarding Plaintiffs damages from SL Green resulting from its breach of contract in an amount to be determined at trial;

<u>against all Defendants</u>:

I.  Awarding Plaintiffs prejudgment interest at the maximum rate allowable by law;

J.  Awarding Plaintiffs reasonable attorney's fees, expert witness fees, expenses and costs of this litigation;

K.   Awarding Plaintiffs such other and further relief as it may show itself to be justly entitled; and

L.   Awarding such other relief as this Court may deem just and proper.

Dated: September 28, 2015          Respectfully submitted,
       New York, New York


By:   /s/ David Boies
      David Boies
      333 Main Street
      Armonk, New York 10504
      Telephone:  (914) 749-8200
      Facsimile:  (914) 749-8300
      Email:  dboies@bsfllp.com

      Philip M. Bowman
      Duane L. Loft
      BOIES, SCHILLER & FLEXNER LLP
      575 Lexington Avenue
      New York, New York 10022
      Telephone:  (212) 446-2300
      Facsimile:  (212) 446-2350

      *Attorneys for Plaintiffs against Defendants*
      *City of New York and City Council of the City*
      *of New York*

By:   /s/ Richard F. Ziegler
      Richard F. Ziegler
      JENNER & BLOCK LLP
      919 Third Avenue, 37th Floor
      New York, New York 10022-3908
      Telephone: (212) 891-1600
      Facsimile: (212) 909-0894

      David J. Bradford
      [pending *pro hac vice* admission]
      JENNER & BLOCK LLP
      353 N. Clark Street
      Chicago, Illinois 60653
      Telephone: (312) 923-2975
      Facsimile: (312) 840-7375

      *Attorneys for Plaintiffs against all Defendants*

39